IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs February 13, 2002

## ANTIONE HARBISON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 98-B-1283     Walter C. Kurtz, Judge**

---

**No. M2001-00887-CCA-R3-CD - Filed April 10, 2002**

---

The petitioner, Antione Harbison, appeals the denial of post-conviction relief from the Davidson County Criminal Court. The petitioner pled guilty on August 13, 1999, to aggravated rape and attempted first degree murder. For the aggravated rape charge, the petitioner waived his sentence range, and the court sentenced him as a violent offender to thirty years with 100% of the sentence to be served. For the attempted first degree murder charge, the court sentenced the petitioner as a Range 1, standard offender and imposed a concurrent fifteen-year sentence. The petitioner appeals his denial of post-conviction relief, claiming that (1) his "defense counsel at the time of the plea was ineffective in failing to investigate [petitioner's] mental health and his ability to understand the nature of the charges against him, the guilty plea he entered, and the sentence he was to serve" and (2) the post-conviction court "erred in the post-conviction proceeding by denying [petitioner] an *ex parte* mental evaluation of the [petitioner's] competency by a private expert."

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

George Travis Hawkins, Franklin, Tennessee, for the appellant, Antione Harbison.

Paul G. Summers, Attorney General and Reporter; Gill Robert Geldreich, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant filed a *pro se* petition for post-conviction relief in the Davidson County Criminal Court, alleging that his convictions were based on involuntary guilty pleas and that he had ineffective assistance of counsel. The court appointed counsel to represent the petitioner, and counsel filed an amended petition, as well as a motion for an *ex parte* hearing to request a private mental evaluation. On January 9, 2001, the post-conviction court denied this motion. On March 19,

2001, the court denied the petitioner's petition for post-conviction relief. The petitioner then filed a timely notice of appeal.

## DISCUSSION

The petitioner's two trial counsel and his father were the only witnesses to testify at the post-conviction hearing.

The petitioner's first attorney said that, as of the time of her representing the petitioner, she had practiced law for six years and began in August 1993 as an assistant public defender. She had tried "at least a dozen" jury trials by 1998, when she represented the petitioner. She testified that although she was initially assigned to represent the petitioner, he retained another attorney to represent him before his preliminary hearing. The retained attorney later asked to be relieved, and she was again appointed to represent the petitioner. She described the petitioner as "slow," and she felt that his total comprehension of what was said during their meetings varied from one meeting to the next. She also said that the petitioner's father had informed her that the petitioner had attended special education classes in school.

She stated that she personally had never requested a psychological examination of the petitioner. She said that she thought the retained attorney had started to request the examination but then had contacted the public defender's office to submit the order for him. She thought that her office might have ultimately done the order for the examination but said she did not remember actually signing the order herself.

She also testified that she was uncertain whether the retained attorney completed the evaluation process with the petitioner. She said that her office did not obtain a psychological evaluation of the petitioner once she was reassigned to the petitioner's case. After the petitioner filed two complaints with the Board of Professional Responsibility concerning her representation, she requested to be relieved from further representation of him. Another public defender was then assigned to represent the petitioner. She prepared a summary for her successor counsel about the issues concerning the petitioner's case. After that, she had very little contact with the petitioner's case. However, she remembered talking to someone in her office about a mental evaluation of the petitioner by the Middle Tennessee Mental Health Institute ("MTMHI"). She testified that she had seen the results of that report and believed the report was in the petitioner's file at the public defender's office, although the report was missing from the file at an earlier proceeding.

Counsel stated that she remembered the findings in the report about the petitioner's statements about hallucinations. Despite the fact that she felt the petitioner was "slow," she said that she never believed the petitioner was incompetent. She met with the petitioner's father and recalled he may have mentioned something about the petitioner's mental capacity. She also talked to the petitioner's girlfriend, who never indicated that she thought the petitioner was incompetent or insane. She was aware that the petitioner's girlfriend had tried to get him some psychological help before

he committed the instant offenses. She believed the petitioner understood the charges against him and the possible defenses that could be raised:

> Q. Do you think that Mr. Harbison understood what he had done and the charges and the plea that he entered?
>
> A. I can't speak for the plea because I wasn't a part of that. As far as the charges, the allegations against him, possible defenses, I do believe that he understood quite clearly. I think he exhibited that he understood what defenses were available, what defenses were weak, strong, the pluses and minuses of the State's case.

During cross-examination, counsel explained her interaction with the petitioner during their meetings:

> Q. And I believe there was negotiation between you and I [assistant district attorney general], and perhaps even [successor counsel] and I, before the 30-year finalized offer was fashioned. During that time of negotiations, did you communicate with your client?
>
> A. Yes.
>
> Q. Did he appear to be able to understand when someone said 30 years or 35 years what that meant?
>
> A. Yes, I think he understood it clearly, because his concern was seeing his daughters while they were still young. So he sort of knew it in terms of his children being adults.
>
> Q. Did you go over with parole eligibility to the charges that we had talked to with him? Do you recall talking to him about that, or did you get that far with him?
>
> A. You mean the charges or whenever you made your offer?
>
> Q. When I made my offer.
>
> A. We went over what the charges carried, eligibility, and the fact that the initial 35-year offer and the 30-year offer, that there wasn't any parole eligibility.
>
> Q. Did he communicate with you on that level? Did he take part in that discussion?

A. Yes.

Q. And again, just so that it's clear, it wasn't like you go in there and talk and he just sits there like he's in a coma or something?

A. No, he actively participated. We figured out the math.

Q. Did he interject questions and make comments about that?

A. Yes.

Q. Did he even make suggestions on what other offers could be acceptable or whatever?

A. Yes, both in visits and in letters.

The attorney who represented the petitioner at the time of the guilty plea testified that he became the petitioner's counsel on approximately April 25, 1999. He had practiced law since 1994, as an assistant public defender. He said that he had defended approximately twenty jury cases. He was aware of three defendants represented by the public defender's office who had been determined in a mental evaluation to be incompetent. He said that he had "been dealing with retarded people [his] whole life, as a public defender and the real world." He "didn't have any doubt" that the petitioner would have been determined to be competent. He also testified about MTMHI's evaluation of the petitioner:

Q. You were speaking to MTMHI. You did have a report from them; is that right?

A. Well, I had half a report – or there is half a report in the file which is a social history. I believe that I saw another report, but I cannot find it in the file. So I don't know if that is something [ ] or [petitioner's first counsel] had told me about and then I just believed it existed, and just took it that they believed he was malingering or whether I actually saw the report.

Q. So you are not sure whether you saw the report from MTMHI or not?

A. I do not.

However, counsel said that he and the petitioner's previous attorney believed that the petitioner had been determined to be competent. He explained that he remembered particular details from the mental evaluation, although he could not recall whether he had read the report or had been told about the information:

> Q. [D]o you recognize this document [petitioner's MTMHI evaluation]?
>
> A. The first part I have. The second part, I don't know that I recognize. I just flipped to something, and it was, "At our facility, he said he had visions of seeing snakes and blood coming from the showers." That is something I remember being – either reading this or being told of this event happening at MTMHI. That's not new to me. So I don't know if I had actually seen this report before or had been told about it by [ ]. I don't remember.

According to the psychological evaluation report, the petitioner's evaluations occurred on November 19 and 25, and December 8 and 11, 1997. As part of the evaluation, the following tests were administered: Wechsler Adult Intelligence Scale-Revised, Wechsler Memory Scale, Wide Range Achievement Test-3, Peabody Picture Vocabulary Test-Revised, and Rey Test. Among the comments in the portion of the report styled "Mental Status" was the statement that "[t]hroughout his stay, Mr. Harbison was considered well oriented, alert, and in contact with reality." Regarding the petitioner's statement that, while at MTMHI, he "said he had visions of seeing snakes and blood coming from the showers," the staff psychologist who prepared the report wrote "[t]he veracity of such statements appear questionable, and Mr. Harbison was not treated for reporting such hallucinations." The report states that, while at MTMHI, the petitioner's "eating and sleeping and grooming habits were within normal boundaries and did not raise the suspicion that he was hallucinating or psychotic." Regarding the disparity between the petitioner's responses to a word recognition test which appeared to be "on a beginning first grade level" and a 1981 test which indicated that he read at a "mid-third grade level," the report states that the differing results seemed to result from "the lack of effort that Mr. Harbison appeared to give at Forensic Services."

Test results, which were considered accurate, showed that the petitioner's IQ was in the mid to low 70 range, placing him in the "lower limits of the borderline range of intelligence." The report noted that he claimed to recall only six of fifteen items on the Rey Memory Test, and that a recall of nine or fewer items "is suggestive of malingering a memory deficit." The report further noted that his word recognition responses were at the level of a beginning first grader, contrasting with higher scores when he was tested at school. This portion of the report concluded with the statement that the "possibility of a true visual perceptual deficit [could] not be ruled out." The petitioner's responses to vocabulary testing were "consistent with one attempting to make less than their best effort during psychological testing." Several of the test results suggested that the petitioner was "malingering in mental illness," and the report concluded with the statement that the petitioner's "[p]sychological testing was consistent with an individual attempting to give a distorted impression

-5-

of themselves [sic]." The petitioner's discharge summary concluded with this statement of the attending psychiatrist: "It was concluded that the patient was competent to stand trial, did not meet criteria for insanity defense, and did not meet criteria for commitability."

Counsel stated that while the petitioner was on the lower end of the IQ spectrum, he still felt the petitioner was competent to plead guilty to the charges. He described the circumstances surrounding the petitioner's guilty plea:

> Q. Based on all of your experience, based on the facts as you knew them, your client as you knew him, was the 30-year offer a good deal or a deal that he should have taken?
>
> A. Maybe it wasn't the most wonderful deal from his perspective, but I thought he was going to die in prison unless we could settle it for something less.
>
> Q. And this gives him the hope of not doing that?
>
> A. Yes.
>
> Q. And, again, based on the conversation you had with him and his father, did he seem to grasp that thought?
>
> A. I think he grasped the difference between dying in prison, yes.
>
> Q. And you indicated that during the negotiations, he participated to the extent that he could reject offers that were made?
>
> A. Yes.
>
> Q. And finally accept the one that got us here today; is that correct?
>
> A. Yes.

We note that, during the petitioner's plea of guilty in 1999, the same counsel had advised the court that the petitioner had been evaluated at MTMHI and determined to be "competent and sane." The IQ test, according to counsel, showed that the petitioner's IQ was "about 20 IQ points higher than what case law would indicate as per se incompetent." It appears that counsel was referring to the 1997 psychological evaluation report.

The petitioner's father, Hollis Harbison, Sr., testified that the petitioner received a special education diploma in school and that the petitioner could not read or write. He stated that he thought his son was mentally retarded to a certain extent but believed his son understood the difference

between right and wrong. He also testified that sometime before his son committed the instant offenses, his son claimed to have seen and talked to his dead mother twice. Mr. Harbison indicated that he was not aware of his son having any other hallucinations other than these.

During cross-examination, the petitioner's father described how the petitioner functioned in day-to-day life:

> Q. Mr. Harbison, just a few questions about your son. Prior to his being arrested, your son drove a car, did he not?
>
> A. Yes, he did.
>
> . . . .
>
> Q. He [the petitioner] would have been somewhere around 34 years of age when this incident happened back in 1997; is that right?
>
> A. I think so.
>
> Q. During that time, he had been living separate and apart from you and your wife for several years, had he not?
>
> A. That's right.
>
> Q. And during that time he had lived with different women, including the woman that he was living with when this happened; is that right?
>
> A. That's right.
>
> Q. And he had children?
>
> A. That's right.
>
> . . . .
>
> Q. All of the things you say about it, would you say he was just a little slow?
>
> A. Uh-huh.
>
> Q. But he could still function in the world, couldn't he?

A.  Yes, he could function.

. . . .

Q.  You talked to [petitioner's first counsel], and you also, I believe, talked to [petitioner's second counsel] who represented him when he pled guilty?  [Petitioner's second counsel], do you remember him?

A.  Uh-huh.

Q.  You all talked about the possibilities of if you went to trial, what might happen, if you pled guilty, what would happen.  And at the time your son entered the plea of guilty, you thought it was in his best interest to do that, didn't you?

A.  Yes, sir.

Q.  And it's still in his best interest?

A.  Yes, sir.

At the conclusion, the post-conviction court made findings, which are set out in pertinent part:

About competency to stand trial, both [petitioner's first and second counsel] explained about their conversations with the defendant.  And both explained that while he was slow and at the lower end of the range – and I might add parenthetically that his I.Q., according to these mental health records, is somewhere between 70 and 84 in one case, but they're at least in the 70s by all of these tests done by Metro Education when he was a student.  But both of them indicated that he was able to understand what they said.  He understood the charges against him.  He discussed cogently what was transpiring.

[Petitioner's second counsel] indicated, and it's regrettable that the report that has been made an exhibit was not in the file, but [petitioner's second counsel] recalled seeing this.  He was certainly pretty confident that he had seen part of it.  He remembered reading part of it.  And that report really affirms the sort of informed lay opinion about both of these lawyers that this was an individual competent.

-8-

My reading of the transcript of proceedings[1] on the day he entered the guilty plea doesn't indicate anything other, again, than [petitioner's second counsel] kind of telling me politely to slow down a little and deal with it clause by clause so that the defendant would be sure to understand. And I asked the defendant to come up here and sit next to me just three feet away in the witness chair. Because I usually address them at counsel table, and I wanted to make sure that we had this one-on-one rapport so that I could make sure I was communicating with him.

So I think under all of these facts and circumstances, that the petitioner has failed to carry his burden by clear and convincing evidence that his counsel failed to adequately investigate the petitioner's mental health and for some reason the petitioner was not competent to enter a guilty plea. So the petition is respectfully denied, and I will enter an order consistent with what I've just said.

## ANALYSIS

### I. Standard of Review

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

### II. Ineffective Assistance of Counsel

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the federal standard for determining ineffective assistance of counsel also applies to Tennessee cases). In Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674

---

[1]The record on appeal contains a transcript of the petitioner's pleas of guilty, demonstrating that he was questioned at length by the trial court and gave appropriate responses before the guilty pleas were accepted.

(1984), the United States Supreme Court articulated this federal standard, which is widely accepted as the appropriate standard where a convicted petitioner claims his counsel's assistance was defective. This standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063, 80 L. Ed. 2d at 692. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693. The Strickland Court further explored what would constitute "deficient performance" in the first prong of the test:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated, "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069, 80 L. Ed. 2d at 699; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

When post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the findings of fact and conclusions of law of the post-conviction court are given the effect and weight of a jury verdict, and, as previously noted, this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance. See Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695. Further, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999), "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

If a petitioner pleads guilty and then asserts an ineffective assistance of counsel claim, there are additional requirements that the petitioner must prove in order to be entitled to relief. "In cases involving a guilty plea or plea of nolo contendere, the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998) (citing Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985), and Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991)). Hill explains the showing of prejudice which must be made by a petitioner who entered a guilty plea:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

Hill, 474 U.S. at 59, 106 S. Ct. at 370, 88 L. Ed. 2d at 210.

The petitioner claims that his counsel were ineffective because they failed to investigate both his mental health and his ability to understand the charges against him, his guilty plea, and his sentence. The December, 1997, MTMHI report concluded that the defendant was competent to stand trial, and nothing in the record on appeal shows that his condition had changed in the approximately two-year period between this report and examination and the pleas of guilty which are the subject of this appeal. Thus, even if his counsel, who were the subjects of the post-conviction petition, had been completely unaware of this report, it is difficult to envision how the petitioner could demonstrate prejudice. There simply is no basis for our concluding that a 1998 or 1999 evaluation

would have resulted in a different conclusion than that occurring in 1997. However, the record shows that both counsel were aware of the earlier mental evaluation and had reviewed at least portions of it, with counsel who represented the petitioner at the guilty pleas referring to it during the trial court's questioning of the petitioner before acceptance of the pleas. Thus, as to the complaints that counsel were deficient in not obtaining another mental evaluation, the petitioner has failed to prove either that counsel were deficient or that he was prejudiced.

We reach a similar conclusion as to the petitioner's claim that he was "unable to meaningfully participate and assist his counsel in his defense or to understand the negotiated plea agreement." Both counsel testified that he did participate in his defense, with counsel at the time of the pleas of guilty testifying as well as to those pleas. Our review of that testimony, as well as the transcript of the guilty plea hearing, fully supports the conclusion of the post-conviction court that the petitioner was competent and understood and participated in the guilty plea process. Considering the totality of the circumstances of the pleas of guilty, we conclude that the post-conviction court was correct in determining that the petitioner failed to demonstrate that his counsel were ineffective in this regard either. See State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995).

### III. Denial of *Ex Parte* Mental Evaluation

The petitioner also has assigned as error the refusal of the post-conviction court to appoint an expert to perform a mental evaluation for the hearing. Counsel renewed this motion at the conclusion of the petitioner's proof at the post-conviction hearing.

Two decisions of our supreme court are relevant to this claim. First, in State v. Barnett, 909 S.W.2d 423 (Tenn. 1995), our supreme court, concluding that the federal constitution entitled a defendant in a noncapital case to a state-funded psychiatric expert, established the procedures for doing so. Generally, the trial court is to hold an *ex parte* hearing on such a request after an indigent defendant "in a written sealed motion to the trial court alleges particular facts and circumstances that raise the question of the defendant's sanity." Id. at 429-30. However, in Davis v. State, 912 S.W.2d 689, 694 (Tenn. 1995), in response to a post-conviction petitioner's request, following a rape conviction, for a "scientific analysis of petitioner's bodily fluids," the court concluded that he was not entitled to such testing at state expense. The court stated "that the state is not required to provide expert assistance to indigent non-capital post-conviction petitioners." Id. at 696-97. Additionally, we note that Tennessee Supreme Court Rule 13, section 5 provides, *inter alia*, that in a capital case, the post-conviction court may provide investigative or expert services. Even if this indigent petitioner had the right to a mental evaluation as the result of his post-conviction claims, we could not conclude that the post-conviction court erred in not providing this service.

The petitioner's motion requests an *ex parte* hearing "in order that a confidential request can be made of the Court for defense services to be provided in support of the preparation of Mr. Harbison's Petition for Post Conviction Relief." We have previously concluded in this opinion that the evidence presented at the post-conviction hearing did not support the petitioner's claims that counsel were ineffective in not requesting another mental examination before his most recent guilty

plea. We now conclude that no claim in the motion for an *ex parte* hearing, or any proof subsequently presented, supports the claim that a second mental examination was justified. Accordingly, the post-conviction court did not abuse its discretion in denying the request for an *ex parte* hearing.

**CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the order denying post-conviction relief.

_____
ALAN E. GLENN, JUDGE